**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 29 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

      v.

TORREN REED TOMPKINS,

      Defendant - Appellant.

No. 98-8064

(D. Wyoming)

(D.C. No. 97-CR-00090-01D)

---

**ORDER AND JUDGMENT**   *

---

Before **ANDERSON** , **KELLY** , and **BRISCOE** , Circuit Judges.

---

    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal.  See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

    Torren Reed Tompkins appeals his conviction and sentence for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and

---

    *This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

924(a)(2). He contends that the evidence was insufficient to support his conviction. He also contends that the district court erred by (1) failing to properly instruct the jury regarding the elements of the charged offense; (2) admitting highly prejudicial photographs of him; and (3) enhancing his sentence for obstruction of justice. We affirm.

## BACKGROUND

According to the uncontroverted trial testimony, on February 14, 1997, shortly after Tompkins was paroled from California state prison, he flew to Salt Lake City, Utah, where he was met by his girlfriend Deborah Lord who had driven down with a coworker from Green River, Wyoming. Lord and her coworker had come to take Tompkins back to Green River where he was going to live with Lord. During the return drive, Tompkins asked Lord about his .22 caliber pistol, as well as his knives and lock picks, which Lord had kept for him while he had been incarcerated. R. Vol. VI, at 135, 154-55. Because the probation department had advised her that Tompkins could not have access to firearms, Lord had previously put the gun, the knives, and the lock picks into a

brown box, and she had given them to another coworker for safe keeping.[1] Id. at 153-54; R. Vol. VII, at 282.

When Lord told him what she had done, Tompkins became angry and abusive, and he demanded that she get his things back. R. Vol. VI, at 135-36, 154. About a week later, Lord and Tompkins drove to the trailer of the coworker who was keeping the box. Tompkins stayed in the truck while Lord attempted to retrieve the box with Tompkins' things. Id. at 156; R. Vol. VII at 284. However, the coworker had stored the box at another location, so Lord and Tompkins left empty-handed. Later that day, the coworker got the box, returned it to Lord at her trailer, and left. R. Vol. VI, at 181; R. Vol. VII, at 286. At that time, the coworker did not see Tompkins who was inside the trailer, lying on the couch. When Lord told him what had been delivered, Tompkins took the box from Lord, opened it, took out the gun, handled it for a few minutes, and then put it back in the box with the knives and picks, taped up the box, and marked it "grandma's china doll." R. Vol. VI, at 156-57, 182. Tompkins then instructed Lord to put the box inside a larger box full of Lord's old clothes and to place the larger box in the storage shed located next to the trailer; afterwards, he repeatedly insisted that

---

[1]The gun was in its own separate small blue box. The gun and its blue box were introduced into evidence together, and, on several occasions, identified together. See R. Vol. VI, at 81, 120; R. Vol. VII, at 282.

Lord keep the key to the shed on a key hanger in the trailer so that he could have access to it.   Id. at 156-57, 182, 236-37.

Meanwhile, Tompkins' parole officer knew that Tompkins was living with Lord.  She was also a customer of the business where Lord worked, and she had frequent conversations with other workers there.  As a result of information she gained from those conversations, she conducted a search of the residence property.   Id. at 76.  After searching the trailer, she obtained the key to the shed from Lord.  When it became apparent that the shed would be searched, Tompkins protested, saying that everything in the shed belonged to his cousin Darren Allen. Id. at 79.  Once in the shed, the parole officer found the gun, still stored in the box of Lord's clothes, in the taped box marked "china dolls."      Id. at 80-82.  After the discovery, she and the two other officers who were with her each handled the gun and packaging without attempting to preserve any prints.      Id. at 82-83. Eventually, the gun and its box were tested for fingerprints, but agents were able to recover only one usable latent print, which could not be matched to Tompkins or to any of the other persons, officers, or agents known to have handled the property.  R. Vol. VII, at 321,    345.

At the time of the search, Lord told the searching officials that the gun belonged to Tompkins.  However, after Tompkins' parole was revoked and he was taken to jail, he made repeated calls to Lord in which he threatened to beat her up

unless she wrote an exonerating letter to the California Board of Parole. R. Vol. VI, at 184-85, 192-93. Finally Lord wrote the requested letter, stating that the shed and all the property in it belonged to Darren Allen, and that Tompkins neither had knowledge of the gun nor access to the shed.     Id. at 187-90. On August 22, 1997, after he had been indicted in this case, Tompkins wrote Lord an invective-laced letter which accused her of lying, complained about her running her mouth, and also stated, "I'll drag you down too!" and "Your [sic] going down too!" Appellee's Br., Addendum at 1-3.

In May 1998, a jury found Tompkins guilty as charged. The district court subsequently enhanced Tompkins' sentence for obstruction of justice. Tompkins then brought this appeal.

## DISCUSSION

### I.    Sufficiency of the Evidence

As his first claim of error, Tompkins contends that the evidence was insufficient to support his conviction. We review the question of sufficiency of the evidence de novo.     United States v. Rith   , 164 F.3d 1323, 1337 (10th Cir. 1999). Evidence is sufficient to support a conviction if, viewed in the light most favorable to the government and drawing all inferences in the government's favor, it would allow a reasonable jury to find the defendant guilty beyond a reasonable

doubt.  United States v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997).  In applying this standard, "we consider the collective inferences drawn from the evidence as a whole, and we will not overturn a conviction unless no reasonable jury could have reached the disputed verdict."  United States v. Bell, 154 F.3d 1205, 1208 (10th Cir. 1998).  Additionally, we do "not question a jury's credibility determinations or its conclusions about the weight of the evidence."  United States v. Johnston, 146 F.3d 785, 789 (10th Cir. 1998).

To convict a defendant of violation of 18 U.S.C. § 922(g)(1), the jury must find, beyond a reasonable doubt, that (1) the defendant was previously convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm or ammunition; and (3) the possession was in or affecting interstate commerce.  United States v. Taylor, 113 F.3d 1136, 1144 (10th Cir. 1997).  Although Tompkins concedes the first and third elements, he disputes the sufficiency of the evidence on possession.

For purposes of § 922(g), possession includes both actual and constructive possession.  Id.  A person has constructive possession when he or she knowingly holds the power to exercise dominion or control over the firearm and the premises where it was found.  United States v. Wilson, 107 F.3d 774, 778, 779-80 (10th Cir. 1997).  In cases involving "joint occupancy" of premises, the government is required to show some nexus between the defendant and the firearm.  United

States v. Mills , 29 F.3d 545, 549 (10th Cir. 1994). In such cases, we will sustain a conviction if there is evidence which supports at least a plausible inference that the defendant had both knowledge of and access to the firearm. Wilson , 107 F.3d at 780.

Tompkins argues the testimony of Lord was insufficient to establish that he constructively possessed the firearm. Essentially, Tompkins argues that the letter which Lord wrote to the California Board of Parole states the truth about his lack of knowledge of or access to the gun. He contends that her contrary testimony was provoked by a lovers' spat, and, at the very least, Lord's recanting of the letter she wrote to the parole board demonstrates that she is an admitted liar, whose new statements cannot be trusted. He claims that only Lord knew about and had access to the gun, and her testimony regarding his ownership of the gun and his access to it is inherently unreliable. We disagree.

Notably, several aspects of Lord's testimony were corroborated by other witnesses: Tompkins' wife testified that she had given the gun to him in 1989 or 1990. R. Vol. VI, at 119-20. Tompkins' demand that Lord recover the gun was confirmed by Lord's coworker who made the round trip drive with her to Salt Lake City. Id. at 135, 154. The other coworker, to whom Lord had given the gun, testified that, on the day Lord came to his trailer to retrieve the gun, Tompkins had driven her over and had stayed out in the truck. Id. at 156. Darren

Allen testified that he and Lord had brought a load of Tompkins' things from California, including a gun, and had stored most of Tompkins' things in the shed. Id. at 198, 202. Whatever Tompkins' view of Lord's credibility, the jury apparently believed her. Under the circumstances, that determination must stand. Accordingly, the evidence was sufficient for a reasonable jury to conclude that Tompkins had knowledge of and access to the gun, and that he therefore constructively possessed it.

## II.      Jury Instruction

In an argument which largely reiterates his sufficiency of the evidence argument, Tompkins contends that the district court improperly instructed the jury as to the elements of the charged offense. We review the district court's decision whether or not to give a particular jury instruction for abuse of discretion. Wolfgang v. Mid-America Motorsports, Inc. , 111 F.3d 1515, 1525 (10th Cir. 1997). However, we review de novo the ultimate question of whether the instructions, as a whole, correctly stated the governing law and provided the jury with a proper understanding of the issues and applicable standards.      Id. at 1526.

In this case, Tompkins complains about Jury Instruction No. 21, which stated as follows:

> When constructive possession is based on circumstantial evidence, authority, dominion, or control may be inferred if, under

circumstances in which the premises is jointly occupied, the evidence shows some connection or nexus between the defendant and the firearm, such as knowledge of and access to the firearm. You may not infer authority, dominion, or control solely based on the joint occupancy of the premises.

Appellee's Br., Addendum at 9.

Tompkins attacks instruction No. 21 as internally inconsistent and significantly misleading, and he contends the district court further abused its discretion by refusing to submit his own proffered instruction which stated: "Mere control or domain over the place in which the gun was found by itself is not enough to establish constructive possession when there is joint occupancy of a place." [2] Appellant's Br. at 8. We disagree. The district court has considerable discretion in the wording of instructions, "as long as they adequately present the law and the issues." United States v. Wolny, 133 F.3d 758, 765 (10th Cir. 1998). Having reviewed the instructions as a whole, we conclude that they properly set

---

[2]Tompkins notes he was nowhere near the shed when it was searched, asserts he did not occupy it, claims that "arguably" he had no dominion or control over it, and further complains about the agents' mishandling of the evidence. Appellant's Br. at 9. In the first place, whether Tompkins was near the shed or personally occupied it when the gun was found is irrelevant to a finding of constructive possession. Second, Lord's testimony—that Tompkins insisted she keep the shed key hung up so he could get to it—contradicts his claim that he had no dominion or control over the shed. Finally, Darren Allen's testimony that most of Tompkins' possessions were also placed in the shed, R. Vol. VI, at 201-02, indicates that Tompkins did "occupy" it.

forth the law of this circuit on constructive possession in joint occupancy situations. [3]

## C.    Admission of Photographs

As his third claim of error, Tompkins argues that the district court erred by admitting highly prejudicial photographs of him.  We review a district court's decision to admit evidence for abuse of discretion.       United States v. McIntosh   , 124 F.3d 1330, 1338 (10th Cir. 1997).

Tompkins protests that the court allowed pictures which purported to show him standing and physically able to access the shed.  He contends that these pictures prejudiced him before the jury, because they implicitly suggested that he was faking disability when he appeared at trial in a wheelchair.  He also impugns either the authenticity or the foundation for the photos because they show snow on the ground at a time when the weather service reported no snow on the ground. Significantly, he makes no claim that the nature or subject matter of the photos is inflammatory.  As the government correctly observes, the admitted candids served a proper demonstrative purpose.  We find no error in their admission.

---

[3]The instructions which relate directly to the issue of possession are Instruction Nos. 19-21.  Appellee's Br., Addendum at 7-9.

**D.     Sentence Enhancement**

As his final claim of error, Tompkins contends that the district court erred by enhancing his sentence.  We review the district court's factual determinations concerning an obstruction of justice enhancement for clear error, giving due deference to the district court's application of the Guidelines to the facts.     United States v. Hankins  , 127 F.3d 932, 934 (10th Cir. 1997).  Guideline § 3C1.1 mandates a two-level offense increase "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense . . . ."     [4] U.S. Sentencing Guidelines Manual § 3C1.1 (1997).  This enhancement is warranted for a defendant's conduct which "threaten[s], intimidat[es], or otherwise unlawfully influenc[es] a . . . witness."     Id. comment. (n.3(a)).

In this case, Tompkins admits that he wrote Lord a letter which stated, "I'll drag you down, too!" and "Your [sic] going down too!"  However, Tompkins argues that, when he wrote the letter, he could not have known whether Lord would be a witness against him, and, therefore, his letter fails to satisfy the requirement that the conduct be directed at a witness.  We disagree.  The letter specifically states that "The only way they could charge me is if you go to court

---

[4]We have previously interpreted "instant offense" to mean that the conduct must relate to the crime of conviction.  United States v. Gacnik, 50 F.3d 848, 852 (10th Cir. 1995); United States v. Levy, 992 F.2d 1081, 1083-84 (10th Cir. 1993).

and lie again like you and your friends did before!" Appellee's Br., Addendum at 3. Clearly, Tompkins knew that Lord would be a witness, and, by this letter he attempted to influence her testimony.

Next, Tompkins argues that he never intended to obstruct justice, asserting that he only sought to convince Lord not to lie, that he made no threats in connection with any truthful testimony, and that the letter was simply a spirited communication. [5] Again, we reject Tompkins' contentions. The district court's determination to enhance Tompkins' sentence for obstruction of justice was not clearly erroneous.

AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

---

[5]Tompkins also argues that he should have received a separate trial on obstruction. Inasmuch as this argument was not made below, we do not consider it.